## MATEER *against* HISSIM.

The statute of 13 *Elizabeth* does not render void a conveyance made by a man, simply because he was indebted.

A father, being indebted, conveyed to his two sons a tract of land, in consideration of fifteen hundred dollars, for which he took their bonds, and these bonds were subsequently given up, without having been paid, to the sons, by the father, or by his administrators after his death, in pursuance of his direction; upon proof that the father left an estate sufficient to pay all his debts, exclusive of the land thus conveyed to his sons, it was *held*, that such conveyance was not fraudulent and void.

A purchaser from a fraudulent grantee, or a fraudulent debtor, where he has not any manner of notice or knowledge of the fraud, is protected from the operation of the statute of the 27 *Elizabeth.*

WRIT of error to the Common Pleas of *Westmoreland* county.  This was an action of ejectment, for a tract of land, in which *Andrew Mateer* was plaintiff, and *Abner Hissim* and *Michael Kimmel* were defendants..  All parties claimed under the same original title, which was vested in *Michael Kimmel, Sen.,* the father of one of the defendants, a short time before his death.   Previously to the 16th of January, 1818, *Michael Kimmel, Sen.,* was indebted by bond, which had been assigned to *Andrew Mateer,* the plaintiff, in the sum of two hundred dollars, with some years' interest upon it; on that day he sold and conveyed the land in dispute, one hundred and forty-eight acres, to his two sons, *Joseph* and *Michael,* in consideration of fifteen hundred dollars, for which he

(Mateer *v.* Hissim.)

took their bonds payable at a future day. No part of the money was paid during the life-time of the father. A suit was brought by *Andrew Mateer*, against *Michael Kimmel, Sen.*, on the bond, to May term, 1818; but the writ was not served on the defendant, and he died, in June, 1818, intestate. Letters of administration were issued upon his estate to his son *Joseph*, who got into his hands personal estate of the intestate, to the amount of about eighteen hundred dollars, exclusive of the bonds, which were given for the consideration of the land before mentioned; for it did not appear very clearly, whether the father had given these bonds, or part of them, to his sons in his life-time; or whether *Joseph*, his administrator, distributed them after his father's death, in pursuance of an intention which the old man expressed to do so, of which there was some proof. Immediately after the death of *Michael Kimmel, Sen.*, the suit of *Andrew Mateer* on the bond was renewed against the administrator, and a judgment was recovered on the 11th of January, 1819. Upon this judgment a *fi. fa.* issued to August term, 1819, which was returned *"nulla bona."* Previously to this, to February term, 1820, *Mateer* brought a suit on the administration bond of *Joseph*, the administrator, upon which no further proceeding was had until 1825, when he obtained a judgment by award of arbitrators, for the amount of his debt, interest, and costs. No execution was issued on this judgment, because before it was obtained in 1824, others had obtained judgments against *Joseph*, upon which his land, the same which his father conveyed to him, was levied and sold by the sheriff to *S. Trevor*. At this time *Joseph* and all his sureties in the administration bond were insolvent. In 1826 *S. Trevor* sold to *Abner Hissim*, one of the defendants, by articles of agreement, and received four hundred and fifty dollars on account of the purchase-money. *Mateer* then went back to his original suit, and issued an *als. fi. fa.* to November term, 1825, which was levied on the land in dispute, and the same was condemned. To May term, 1827, a *vend. expos.* issued, upon which the land was sold and purchased by *Andrew Mateer*, the plaintiff. *Joseph* and *Michael Kimmel*, soon after they received the conveyance from their father, had divided the land between them; and in this suit, *Hissim* and *Michael Kimmel* severed in their defence. There was some evidence that *Hissim* knew of *Mateer's* claim when he purchased ...

The court (*Young, ....*) submitted to the jury the fact, whether ...

(Mateer *v.* Hissim.)

*J. B. Alexander* for plaintiff in error,

Cited 2 *Atk.* 174. 1 *Yeates*, 574. *Sugdon*, 494. 2 *Chan. Ca.* 116. 12 *Serg. & Rawle*, 454. 1 *Rawle*, 328. 1 *Fondb.* 262. *Cowper*, 434–5 and 711. 1 *Peters C. C.* 460. 1 *Rawle*, 352. 8 *Serg. & Rawle*, 451. 2 *Penn. Rep.* 91.

*Foster* for defendant in error.

That the statute of 13 *Elizabeth* was not applicable to the facts of this case, cited *Rob. Did.* 302. 1 *Rawle*, 244. 1 *Peters Rep.* 464. That admitting that the defendant *Hissim* had notice of a claim of the plaintiffs, yet he is but a purchaser with notice, from a purchaser without notice, and therefore he cannot be effected by the fraud, even if it existed, and was proved. 8 *Cranch.* 462. *Cox's Dig.* 340. No. 47. 2 *Mason*, 252. 4 *Wheat.* 487. 6 *Cranch.* 133. *Sugden*, 531. *Whart. Dig.* 210, No. 91.

The opinion of the court was delivered by

Huston, J.—*Michael Kimmel, Sen.*, in January, 1818, was possessed of five bonds against *J. Beck*, of sixty pounds each; *Beck* was able to pay, and has paid all these since *Kimmel's* death. He had, also, other bonds to the amount of three hundred and twenty pounds, and his personal property was valued at about fifty pounds; in all about eighteen hundred dollars. He was indebted the amount of one bond for two hundred dollars, with four years interest, and to another person twenty-seven dollars. I have stated the above as the debts due to him, though there was some proof, but not positive, that he was, at that time, possessed of more than double this amount; and probably the jury believed he was.

On the 16th of January, 1818, he conveyed to his two sons, *Joseph* and *Michael*, a tract of one hundred and forty-eight acres, (the land in dispute,) by deed, for the consideration of fifteen hundred dollars: no money was paid; but ten bonds were given for the purchase-money; and it was proved that he spoke of giving some of these bonds to *Michael* his son to support him.

On the 16th of June, 1818, old *Michael* was dead, and letters of administration issued to his son *Joseph*. It did not appear whether the intestate had cancelled these same ten bonds, or given them to the obligors in his life-time, or whether they came into the hands of *Joseph*, one of the obligors, as administrator; but it did appear, that *Joseph*, the administrator, as early as the 23d of June, 1818, gave two of the five bonds, first mentioned, to a brother-in-law; and on the 15th of August, 1823, gave the remaining three bonds to a brother. It was stated in the receipt which he took from each of them, that the bonds had been assigned by his father in his life-time; and assuming this to be true, and also taking it for granted that he gave up to *Joseph* and *Michael* these ten bonds in his

(Mateer *v.* Hissim.)

life-time, there remained in the hands of the administrator, the bonds for three hundred and twenty pounds, and the personal property, to enable him to pay two hundred and seventy dollars.

To June term, 1818, *Andrew Mateer* brought suit against *Michael Kimmel, Sen.,* for his debt of two hundred dollars. The writ not having been served, it was renewed to the next term against the administrator; and at January term, 1819, judgment was rendered. To August term, 1819, he issued a *fi. fa.,* which was returned *nulla bona.* To February term, 1820, *Mateer* brought suit on the administration bond of *Joseph Kimmel;* and after permitting it to rest five years, it was referred, under our compulsory arbitration law, and an award was made for the plaintiff for three hundred and thirty-seven dollars and sixty-seven cents. Nothing was done on that judgment, because, in the meantime, *Samuel Trevor* had obtained a judgment against *Joseph Kimmel,* which was revived by *sci. fas.* to August term, 1823, and to the same term had issued a *fi. fa.* and levied it on the lands *Joseph* had got from his father, together with other lands, which were condemned, and on a *vend. expos.* issued by *Joseph Painter,* who had also obtained a judgment against *Joseph Kimmel,* were sold to *S. Trevor,* on the 24th of February, 1824. The price did not pay the amount due *Painter* and *Trevor.* The sheriff's deed to *Trevor* was dated the 24th of February, 1824. *Joseph Kimmel* was then insolvent; and his bail had also become insolvent, though good when they signed his bond. *Mateer* then went back to his original suit; and to November term, 1825, he issued an *als. fi. fa.,* which was levied on the one hundred and forty-eight acres of land sold by *Michael Kimmel,* the elder; and on a *vend. expos.* to May term, 1827, it was sold to *A. Mateer,* the plaintiff, for thirty dollars. In 1826 *Hissim* had purchased, by articles of agreement, from *Trevor,* and had paid four hundred and fifty dollars in part of the purchase-money. It was also in proof, that *Joseph* and *Michael* had divided the land, soon after the conveyance from their father; and *Hissim* and *Michael* severed in the defence.

It may be proper, in discussing this case, to refer to the words of the statute of the 13 *Elizabeth,* which declares "every feoffment, gift, grant, alienation, bargain and conveyance of land, &c., goods, &c., made with intent to delay, hinder and defraud creditors and others of their just actions, debts, &c., shall be henceforth deemed and taken, *only as against that person or persons,* his or their heirs, executors, &c. whose actions, suits, &c. by such guileful, covinous, or fraudulent practices or devices are or shall be in any wise disturbed, hindered, delayed, or defrauded, to be clearly and utterly void, frustrate, and of none effect." This, however, is limited by a proviso, "that this act, or any thing therein contained, shall not extend to any estate or interest in land, &c., had, &c., or thereafter

(Mateer *v.* Hissim.)

to be had, made, conveyed or assured, which estate or interest is or shall be upon good consideration, and *bona fide*, lawfully conveyed or assured to any person, &c. not having, at the time of such conveyance or assurance to them made, any manner of *notice or knowledge of such covin, fraud, or collusion as is aforesaid.*" The statute 27 *Elizabeth*, makes such conveyances void as to subsequent purchasers.

It has been often said, that this statute is in affirmance of the common law; if so, it is a very explicit declaration of what the common law was; yet, neither in *England* or *America*, have the decisions on it been uniform or reconcilable with each other; and I wish I could say those in our own state are an exception. The statute does not render void a conveyance made by a man, simply because he is indebted. In this state, if land be sold which is bound by a judgment, and that judgment is not discharged, it may be levied on in the hands of the vendee; but a judgment obtained afterwards, cannot generally be levied on lands in the hands of him who bought it and got his deed before judgment obtained. If not generally, when can it be so levied? Only when the purchaser, as well as the seller, knew of and joined in the fraud. By the very words of the proviso, the act does not extend to cases in which the purchaser had no notice or knowledge of the covin, &c. If it were otherwise, the most honest vendee who bought and paid a full price, would lose his land or goods, because the vendor instantly absconded and took the purchase-money out of the reach of his creditors. It is reasonable, that he who purchases and pays, with the intent and purpose of enabling the vendor to carry away the funds and defraud his creditors, should lose; but it would not be easy to find a reason why an honest man, who knew of no such design, and suspected no such result, should suffer; so far, there is, on this point, no dispute. But it has lately been decided in *Connecticut,* and by *Chancellor Kent,* in *New-York,* that although a fair purchaser from a fraudulent debtor is protected, yet a fair purchaser from the fraudulent grantee of a fraudulent debtor is not. I premise that I do not speak of cases, in which the deed itself gives notice which may lead to suspicion, or where on its face it is voluntary; for there, it cannot be said that a purchaser *has not any manner of notice.*

I hold that a purchaser from a fraudulent grantee is as much protected as one from the grantor, where he has not any manner of notice or knowledge of the fraud or collusion; because, in the enacting clause, it is the fraudulent feoffment, gift, &c. which is avoided. In the proviso, it is the estate or interest of *any person who had no manner of notice or knowledge of the fraud* which is protected. Any innocent man who acquires *bona fide* an estate in land so fraudulently sold, without knowledge of the fraud, is, then, within the words of the law. The *bona fide* purchaser from a

debtor intending to defraud his creditors is protected; because, in the ordinary course of business, he has done what he could lawfully do; and he being honest, is not to suffer for the fraud of another, of which he had no knowledge or suspicion.    It would not be easy to give a reason why another man, or the same, also acting in the ordinary course of business, shall lose his property on account of a fraud committed by two others, but of which he had no manner of notice or knowledge.    The creditor loses in the first case, because the fraudulent person, having got himself or his property out of his power, there is no way to compensate such creditor, except by taking that compensation from an honest man, who never dreamed of injuring him.    And the same reason applies with equal force, to protect the innocent and *bona fide* purchaser from the fraudulent grantee.    I object to the decision in 1 *Day.* 527, and 3 *Johns. Chan.* 371–2, because we have the *British* statute in force unchanged: it has been changed in *New-York,* by uniting the statutes of the 13 and 27 *Elizabeth* into one act, consolidating the two provisions into one, and changing some of the expressions.    In connection therewith they have an act of their own, and its phraseology I don't know, and cannot here ascertain.    But suppose they have retained the very words, we ought not to follow those decisions.    *Judge Story* has shown, in 2 *Mason,* 376, *et seq.* that those decisions are a departure from the construction long settled in *England;* it would be easy to add to the cases cited by him.    See *Sug. on Ven.* 471.    When we adopted that statute, we took along with it its then settled construction.    If *our* circumstances, *modes* of business, or other cause, required it, *we* may make the necessary change in the construction; but we cannot follow the changes made by every tribunal in the twenty-four states.    Several, and among them *Massachusetts* and the Supreme Court of the *United States,* (See 6 *Cranch,* 133,) adheres to the construction settled in *England;* and the latter court has said we ought not to follow the changes made in *England,* since our separation. 5 *Peters,* 280.

The deed from the elder *Kimmel,* on its face, purported to have been made for full and valuable consideration.    *Joseph* entered upon and enjoyed his part in severalty for six years before *Trevor* purchased it at sheriff's sale.    There is no allegation that *Trevor* had any knowledge or notice of any fraud; his estate is then protected by the express words of the proviso.    But it is said *Hissim* heard a rumor of some adverse title, before he contracted with *Trevor.*    To this it might be answered, that *Trevor* is still the owner, being unpaid, except in part; but there is another answer: if *Trevor* held it clear of this claim, he can sell it clear of it: whoever owns land in fee simple, unincumbered, can sell it in fee simple, unincumbered, as long as an estate in fee simple retains the meaning heretofore attached to it.    The law knows not of an unin-

cumbered estate in fee simple, which is forfeited by alienation; or which the owner cannot give a good title for to the purchaser.

But it is said that the part of *Michael Kimmel* is subject to this claim. Whether the deed to the two sons was with intent to defraud any person, either on the part of the father or sons, was a question of fact, as the *intention* must always be. 3 *Dal.* 321–3. Taking the property retained by the old man at the lowest estimate, it was equal to five times the amount of all he owed; and this on the supposition that it was intended that the bonds for the consideration of the sale should never be paid. Every voluntary settlement is not void, nor voidable by any creditor who has no lien on it at the time, if enough and more than enough is reserved to pay all debts.

If this claim had been known to the old man, and he had been craved for it in January, 1818, is it presumable that with bonds to five times its amount, he should have contemplated disposing of his land, and then lying in jail till his death, or being discharged by perjury, to avoid so trifling a claim? Had he disposed of every thing he had, such might have been the presumption, and perhaps an irresistible presumption, which would take a case from the jury; but when he reserved very ample funds, it became a question for the jury.

If the father had afterwards disposed of all his property, or lived to spend it; or if, as in *Thompson* and *Daugherty*, he was about to enter into extensive business, where large debts might be incurred, it might have altered the case; but nothing of the kind occurred, or was in contemplation. Take it at the worst, he preserved to the day of his death, far more than sufficient for his debts.

I am aware that in *England* a voluntary conveyance is now held conclusively void against a subsequent sale for a valuable consideration; and of course against subsequent creditors. The law was at one time otherwise; and that prior construction having been adopted in practice here, the alteration absolutely fixing fraud on a voluntary family settlement, ought not to be followed. 5 *Peters,* 280.

I am also aware, that a voluntary deed has been said to be void, where the person is indebted at the time, unless the presumption of fraud is repelled by those debts being provided for by mortgage, or provision in the deed itself. The phrase, "indebted at the time," must be taken, however, with some limitation; it cannot mean a man indebted for a night's lodging or a hat. It must mean some debt bearing some proportion to the property retained, which may render its payment doubtful; some debt worth providing for by a mortgage, or in a deed; and if it be such a debt, I know no authority and no reason for saying, it must be provided for in either of those ways. A deed ought not to be set aside on account of a debt so small, that the grantor at the time, and all his life, had property

(Mateer *v.* Hissim.)

to pay five times its amount, and left suoh property at his death, expressly subject to that debt.

If the debt in question be lost, it was lost by the fraud or misfortune of the administrator, and the laches of the creditor.

. Ross, J. dissented.

Judgment affirmed.